922 So.2d 1267 (2006)
Robert E. RIDDLE, et al., Plaintiffs-Appellees
v.
Gaylon D. SIMMONS and Louisiana State Gas Corporation, Defendants-Appellants.
No. 40,000-CA.
Court of Appeal of Louisiana, Second Circuit.
February 16, 2006.
Rehearing Denied March 9, 2006.
*1270 Sentell Law Firm, LLC by C. Sherburne Sentell, Jr., C. Sherburne Sentell, III, Minden, for Plaintiffs-Appellees, Robert E. Riddle and Dorothy Turner Riddle.
James D. Caldwell, Tallulah, for Intervenor-Appellee, James Ralph Baker.
Gordon, Arata, McCollam, Duplantis, et al. by Ewell E. Eagan, Jr., Donna Phillips Currault, New Orleans, for Defendant-Appellant, Gaylon D. Simmons.
Hargrove, Smelley & Strickland by Joseph L. Hargrove, Jr., Shreveport, for Defendant-Appellant, Louisiana State Gas Corporation.
Before STEWART, CARAWAY and LOLLEY, JJ.
LOLLEY, J.
Gaylon D. Simmons ("Simmons") and Louisiana State Gas Corporation ("LSG") appeal a judgment from the Second Judicial District Court, Parish of Jackson, State of Louisiana in favor of Robert E. Riddle in the amount of $621,318.02, together with legal interest from the date of judicial demand until paid, as well as court costs, including expert witnesses fees incurred by plaintiffs. Riddle answered the appeal, seeking an increase in the damage *1271 award. For the reasons cited herein, we reverse in part, affirm in part and amend in part.

FACTS
In December 1977, Robert E. Riddle,[1] James R. Baker, Gaylon D. Simmons, and Charles Harold Allen (hereinafter collectively the "partners" or the "Group") purchased 1,887 acres of land in Jackson Parish, Louisiana and financed the acquisition as solidary debtors. The 1,887 acres of land (hereinafter the "Timoz Property") was acquired from Timoz Development Company ("Timoz"). Timoz had previously purchased the land from Crown Zellerbach Corporation ("CZ") in 1975. Three fourths of the mineral rights to the Timoz Property was reserved by CZ. Crown Zellerbach also retained the executive mineral rights over the remaining one quarter of the minerals attendant to the ownership of the land which the Group eventually acquired by their acquisition of the Timoz Property. Aside from the mineral rights, the main value attributable to the rural Timoz Property centered on its prospects for the Caney Lake project planned for Jackson Parish. The lake did not become a reality until the mid-1980's.
On September 23, 1983, Riddle filed this action against his brother-in-law, Simmons, and Simmons' wholly-owned corporation, LSG, alleging that Riddle, Baker, and Allen had entered into a joint venture with Simmons to develop the gas rights in the co-owned land and to construct a pipeline in that connection. The petition further averred that Simmons, acting through his solely-owned corporation, LSG, converted profits from gas agreements associated with the Timoz Property and a gas pipeline to his use, while paying only $60,000 to the parties (later asserted to be by deposit into a joint bank account).
On May 22, 1986, Baker intervened to set forth similar allegations of a joint venture. He maintained that each of the individuals possessed an area of expertise which they agreed to use in developing the property. Subsequently, on June 29, 1992, Allen filed an intervention, as a plaintiff, presenting allegations similar to those of Riddle and Baker. He specifically averred that Simmons set upon a "plan and/or scheme to deprive the other parties of their profits from the operation of the [joint venture]." The pleading sought damages, an accounting, and intervenor's share of the enterprise earnings. This suit has come before this court on several occasions. See Riddle v. Simmons, 548 So.2d 113 (La.App. 2d Cir.1989) ("Riddle I"); Riddle v. Simmons, 589 So.2d 89 (La.App. 2d Cir.1991), writ denied, 592 So.2d 1316 (La.1992)("Riddle II"); Riddle v. Simmons, 626 So.2d 811, (La.App. 2d Cir. 1993), writ denied, 93-2920 (La.04/29/94), 637 So.2d 459 ("Riddle III").
The following uncontested facts were stipulated at trial by the parties:[2]

*1272 1. At one time, Crown Zellerbach owned over four thousand acres of land in Jackson Parish, Louisiana.
2. In December 1975, Timoz Development Corporation acquired approximately 2,025 acres from Crown Zellerbach of the same lands.
3. When Crown Zellerbach sold Timoz the land, it reserved the mineral "executive rights" in that transfer, which allowed Crown Zellerbach to continue exploration without the need to obtain consent from Timoz.
4. After Timoz Corporation had made a timber sale on the Timoz Property, it sold the property to the Group.
5. Plaintiffs and Simmons signed an Agreement to Purchase approximately 1,887 acres of the Timoz Property on or about October 30, 1977.
6. The purchase price was $2,122,915.80, which included a cash payment and the assumption of Timoz's December 12, 1975 promissory note in favor of CZ. Allen obtained short-term financing (90-day renewal notes) from Commercial National Bank in Shreveport ("CNB"). The note was a solidary obligation, with each of the four individuals signing the note in favor of CNB.
7. On November 2, 1977, Gaylon Simmons wrote a letter to his attorney, William Broadhurst, requesting that he check with the Secretary of State to see if the corporate name of "Louisiana Energy Development Company" was available. Gaylon Simmons sent a copy of this letter to plaintiffs, Harold Allen and Robert Riddle. In May of 1978, Gaylon Simmons formed a corporation by the name of Louisiana Energy and Development Corporation (LEDCO), but plaintiffs were not incorporators nor did they ever own any stock in this company.
8. After signing the October 1977 Purchase Agreement, Jumonville, Hartley, Plauche & Broadhurst provided the Plaintiffs and Simmons with legal advice regarding the pros and cons of different business-entity structures (including partnerships and corporations). The four men purchased the Property in their individual capacities, with each owning an undivided 25% interest and each being responsible for paying 25% of the purchase price.
9. The Group opened a joint bank account in the name of Allen, Baker, Simmons and Riddle at the Jonesboro State Bank in about December of 1977 for the purpose of paying for the property and its related expenses. Over the next several years, members of the Group including Gaylon Simmons deposited funds in the account from time to time. On or about October 1, 1979, Gaylon Simmons mailed a $60,000 deposit into the Group's joint bank account at the Jonesboro State Bank.
10. When they purchased the Property, the men did not have a clear or specific plan of how they would pay for it-but agreed to promote the property any way they could to raise money to service their loan for the purchase price. The four men (the "Group") understood that each of them owned a 25% share in the purchase, with each having a "role" in moving the Timoz project toward profitability: Allen (the banker) would arrange for financing *1273 for the project; Simmons (the oil and gas executive) would oversee aspects related to the mineral rights; Baker (the contractor) would build roads for the subdivision development; and Riddle (a businessman) was to work on the marketing and development of the Property in general and oversee the sale of lots.
11. The four men in the Group would often meet and discuss things they might do to raise money to pay for the Property. They talked a lot about many possibilities, including their selling off lake lots and getting revenues from oil and gas wells.
12. In February 1978, on behalf of Simmons, Riddle, Baker and Allen, Mr. Jumonville notified Crown Zellerbach that they believed Crown Zellerbach had abused the mineral executive rights by accepting bonus money or other "up-front" consideration without giving Riddle, Allen, Baker and Simmons a share of such proceeds.
13. Crown Zellerbach was in negotiations with Louisiana Intrastate Gas Corporation ("LIG") (an established corporation in the natural gas business) concerning the "call" on gas at the time when the Group contacted Crown also about the call on gas. At a meeting with Crown Zellerbach in Spring 1978, Plaintiffs/Simmons stated that they were interested in acquiring Crown Zellerbach's "call" on the Clear Branch Field gas.[3]
14. In the Spring of 1978, the Group and their attorney Howell Dennis met with Crown Zellerback executives and, among other things, tried to get Crown to agree to assign Crown's "call on gas" for the entire Clear Branch Field to the Group. However, Crown would require the assignee of its call on gas to agree to take a certain volume of gas each day or pay a penalty of $180,000 per day, which clause is commonly referred to as a "take-or-pay" clause. The Group was not willing to obligate themselves to that provision and left the meeting with the idea that they would not be able to secure the call on gas from Crown but asked the Crown representatives to keep Gaylon Simmons advised on the matter.
15. In April 1978, one of the operators in the Clear Branch Field presented Crown Zellerbach with a proposed gas purchase contract, which triggered Crown Zellerbach's 30-day right of first refusal on the gas from Clear Branch Field.
16. On May 16, 1978, Crown Zellerbach assigned its "call" on the Clear Branch Field gas to LIG.
17. The call on gas was assigned by Crown in a document styled "Assignment of Preferential Right to Purchase and Take Gas in-Kind" between Crown Zellerbach and Louisiana Intrastate Gas Corporation on May 16, 1978.
18. LSG was converted from a partnership to a corporation in 1975, two years before Plaintiffs acquired their interest in the Property. When originally formed as a partnership in 1974 and after conversion *1274 into a corporation in 1975, LSG was owned 75% by the Pottharst family and 25% by Simmons. Shortly after its formation, LSG began constructing, owning and operating pipelines.
19. After Mr. Pottharst died in an airplane accident over Lake Pontchartrain, Simmons negotiated with his estate and family members to acquire Delta Gas, Inc., LSG, and other businesses. Simmons acquired those corporations on May 31, 1978.
20. On August 31, 1978, LSG was issued a certificate of transportation from the Louisiana Commissioner of Conservation in connection with a pipeline servicing the Clear Branch Field.
21. In September 1978, LIG contracted with LSG to construct, operate and maintain a pipeline running through Jackson, Winn and Natchitoches parishes.
22. At the time the pipeline was built, there were several shut-in gas wells in the vicinity of the Timoz land that were connected to the Clear Branch Pipeline.
23. As of September 14, 1978, when LSG entered into a contract with Kaiser Aluminum and Chemical Corporation ("Kaiser") and LIG to build the Clear Branch Pipeline, Gaylon Simmons owned 100% of the stock of LSG which was then called Louisiana State Gas Corporation.
24. The transportation agreement of September 14, 1978, provided that LSG would build the pipeline and be entitled to charge both demand charges and transportation fees. The demand charges would be payable irrespective of whether the gas went through the pipeline or not and were sufficient to service LSG's loan with Morgan Guaranty Bank to build the pipeline. The transportation fees started at five cents per mcf with an escalation clause for increased fees periodically.
25. On September 14, 1978, LSG contracted with LIG and Kaiser to build and operate a gas transportation pipeline to handle the transmission of gas from the Clear Branch Field and Calvin Field. This Clear Branch Pipeline was constructed by LSG at an initial cost of approximately $7.7 million. The pipeline was completed and went online by March of 1979. The pipeline joins another pipeline in the Black Lake area in Natchitoches Parish. The pipeline has a 16-inch diameter main line together with a gathering system for the Clear Branch Field. A portion of the gathering system, a 4-inch line, crosses a part of the Timoz land pursuant to a servitude.
26. The Group had a meeting on or about September 24, 1978. At this meeting, the Group talked about how they were going to develop the Timoz Property to generate revenue to pay for the land, how they might subdivide the property, where the lake might go, how much they should charge for the lots and other development matters. The meeting was secretly recorded without the knowledge or consent of Gaylon Simmons or Ralph Baker.
27. At the September 24, 1978 meeting, Gaylon Simmons discussed among many other things a proposed pipeline that LSG had recently contracted to build, and he *1275 mentioned a pipeline transportation fee of a nickel per mcf. Simmons stated that he estimated it would take somewhere around three cents to cover the operating costs.
28. The pipeline went "online" and began transporting gas by March of 1979.
29. LSG sent the first invoice for the pipeline "demand charges" to LIG in June of 1979, seeking demand charges of $144,463.79.
30. The first demand charge to Kaiser was for $72,431.89 and was reflected in a letter from Kaiser to LSG dated July 10, 1979.
31. On January 7, 1980, the Group met in Shreveport at Commercial National Bank concerning their loan. There was concern among the Group that the bank might not renew the note and/or demand the entire loan be paid.
32. To effectuate the release of LSG/Simmons and Allen, the parties signed an "Act Consenting to Discharge of Co-Maker" in which all parties consented to the discharge of Allen and Simmons/LSG from any co-solidary obligations and consented to the release of the collateral mortgages to the extent of an undivided 1/4 interest to both Allen and Simmons. In that document, Riddle and Baker also acknowledged the continued existence of their indebtedness, and affirmed that the renewal note signed by them is the same indebtedness.
33. In January 1980, LSG acquired Simmons' 25% interest in the [Timoz] property. LSG acquired the entire note, satisfied its 25% portion of the [Timoz Property] debt and released LSG and Simmons from any further obligation on the debt-leaving 75% of the debt owed by Riddle, Allen and Baker.
34. At the same time, rather than be indebted to LSG, Intervenor Charles Allen asked to pay his 25% share of the debt in exchange for a complete release of his interest and security. Although CNB had refused to allow LSG to pay its portion of the debt and remove itself as a solidary obligor, LSG allowed Allen to pay his 25% share of the debt for his release from solidary liability for the debt of Riddle and Baker. Riddle and Baker acknowledged their continued obligation to LSG and executed a new note for a total amount of $648,116.50 payable to LSG.
35. In connection with LSG's January 7, 1980 acquisition of the CNB note, Allen, Riddle, Baker and LSG (through its President Gaylon Simmons) executed an "Act Agreeing to the Sale of Jointly Owned Property" in which each agreed to sell the Property to anyone (including each other) for $1,500 per acre. Riddle and Baker further expressly agreed that, in the event of such sale, their share of the proceeds would be paid to LSG to the extent necessary to satisfy their promissory note dated January 7, 1980, in favor of LSG and secured by the property.
36. In 1980, Riddle, Allen and Baker sued Crown Zellerbach alleging that Crown Zellerbach had breached its mineral executive rights, but they did not include any claim for allegedly failing to assign the "call" to these men. LSG (as successor to Simmons' 25% interest in the property acquired from Timoz) intervened in that proceeding. Riddle, Allen, Baker and LSG settled all claims with Crown Zellerbach.

*1276 37. On October 31, 1981, a Compromise and Settlement Agreement was entered into between Simmons, Annette Simmons, LSG, Crown Zellerbach, Hunt Petroleum, Hunt Energy, Justiss Oil and LIG.
38. LSG, Riddle and Baker also executed an "Agreement with Respect to Release of Obligations Under Promissory Note" in which they agreed that, in the event that Riddle and Baker were not in default, each could pay their pro rata share of all principal and interest due to be released from all further obligations under the promissory notes and mortgages (similar to what LSG and Allen had just done).
39. On January 7, 1983, LSG's attorney, Henri Lapeyre, sent a demand for payment on the note to Riddle and Baker. That note was dated November 30, 1981, for $886,024.19. The interest of Robert Riddle and Ralph Baker in the Timoz land was sold at Sheriff's sale on July 6, 1983. LSG appeared and bid on the property, but the second mortgage holder, Jonesboro State Bank, was the high bidder at the foreclosure sale. Thus, at the end of the day, intervener Charles Harold Allen owned his 25% of the property individually, Jonesboro State Bank owned another 50% in the Timoz Property, and LSG owned the remaining 25% interest in the Timoz Property.
40. The undivided one-half interest (one-fourth each) of Riddle and Baker in the Timoz Property was sold at sheriff's sale on July 6, 1983, for a price of $1,155,000. The high bidder was Jonesboro State Bank. Gaylon Simmons appeared at the sale and (credit) bid on the property, on behalf of Louisiana State Gas.
41. On September 23, 1983, after LSG's foreclosure and the related sheriff's sale, plaintiff Riddle filed this suit against Simmons and LSG.
42. On November 14, 1986, LSG sold its interest in the Timoz Property to Louisiana Energy and Development Corporation, a corporation then wholly owned by Gaylon Simmons. LEDC owned 100% of the LSG stock at that time. This deed is recorded at Jackson Parish Conveyance Book 223 page 426, Register # 287060.
43. On November 14, 1986, LEDC sold the same property mentioned above to Gaylon Simmons and wife individually. This deed is recorded at Jackson Parish Conveyance Book 223 page 443, Register # 287061.
44. The Riddles filed bankruptcy in 1988 and 1994. Those pleadings are the best evidence of their contents.
In 1977, Riddle was a co-owner through Timoz Development Company of the property acquired from CZ in Jackson Parish. On the basis of knowledge that his co-owners wanted to sell their interests, Riddle asked Harold C. Allen ("Allen") to approach Simmons and James Ralph Baker ("Baker") to discuss acquisition of this property. Baker and Simmons had a prior business and social relationship. Baker was in the pipeline business. At this time, Simmons was a part owner of LSG, which also was active in pipeline endeavors. As the discussions progressed, the parties agreed to purchase the property and to manage and develop it for the benefit of all.
*1277 In November 1977, Simmons wrote a letter to his attorney on behalf of the Group requesting that he inquire with the Secretary of State to determine if the corporate name "Louisiana Energy Development Company" (LEDCO) was available. Simmons had the letter copied to the other three men in the Group. The attorney responded to Simmons and copied the letter to the others indicating that the two major investment vehicles available for use were either a corporation or a partnership. The Group opted not to form a corporation, but instead the Group opened a joint bank account at the Jonesboro State Bank under the name "Allen, Baker, Simmons and Riddle." It is the formation of this business Group which lies at the essence of this action.
On December 12, 1977, Allen, Baker, Simmons and Riddle purchased the Timoz Property for $2,122,915.50 represented by a cash payment of $705,019.50, and assumption of a promissory note to CZ for $1,827,896.00. The Group also executed a collateral mortgage and promissory note, arranged by Allen, payable to Commercial National Bank ("CNB") in Shreveport, Louisiana for $500,000. The CZ note was eventually paid to CZ, and the sizeable debt from the property was transferred to CNB.
In the first months of 1978, the Group focused its concern on the mineral development in the Timoz Property which was subject to the control of CZ by virtue of its executive rights. Mineral development of the Clear Branch Field and surrounding areas of Jackson Parish was occurring. A conflict concerning CZ's control over the Group's mineral interest developed. At the same time, the Group began considering the idea of building a gas pipeline to facilitate the emerging production and to encourage the possible exploration of the Timoz Property. They approached CZ both with their concerns over its "management" of their mineral interest in the property and with the idea of possibly receiving from CZ some deal to construct a pipeline. CZ was the owner of a call on gas for a large area of oil and gas interests in the parish owned by itself and other oil and gas operators. This area included the Timoz Property. CZ's call on gas gave it authority to direct the sale of the gas and likewise to be instrumental in the choice for a party to construct a gas pipeline gathering system for the large area of interest.
On March 4, 1978, the four men went to Joyce, Louisiana to meet with a representative of CZ, H.E. Turner ("Turner"), to discuss the "call on gas" in the Clear Branch Field. At this meeting, the Group was informed by Turner that if they were assigned the call on gas, they would be required to agree to a daily take or pay provision of $180,000. Although the evidence indicates the Group had not anticipated this provision, the meeting concluded with CZ indicating no objection to the Group being assigned the call on gas. The Group informed Turner that CZ could contact Simmons on their behalf regarding further developments on the call on gas. Turner testified that subsequent to this joint meeting, Simmons called him requesting that Turner inform him before the call on gas was assigned to anyone. The evidence also indicates that sometime later, Turner received another call from Simmons expressing no objection by Simmons to CZ's assignment of the call on gas to Louisiana Intrastate Gas Corporation ("LIG").[4] On May 16, 1978, LIG did in *1278 fact acquire the call on gas by assignment from CZ. By way of letter dated May 19, 1978, Simmons informed Riddle and copied the letter to Baker and Allen, that CZ assigned to LIG its right to purchase and take gas in-kind from the Clear Branch Field. Thereafter, without informing the Group, Simmons, through LSG, negotiated the rights to construct and operate the gas gathering pipeline, which was necessary to market the gas from the field.
In August 1978, LSG acquired a certificate of transportation for a pipeline to service the Clear Branch Field. That following September, LSG was awarded a contract with LIG and Kaiser Aluminum and Chemical Corporation ("Kaiser") to build and operate a pipeline for the transmission of gas from the Clear Branch Field. The gathering system would service the field and extend approximately 30 miles into Natchitoches Parish to connect with an existing pipeline owned by LIG, which would transport the gas to the enduser, Kaiser. This contract set transportation fees to LSG to begin at $.05 cents per mcf, with a provision for annual increased fees.
Following these events, Simmons informed Baker that he had signed a deal for the Clear Branch Field pipeline. Simmons asked Baker to inform the other two men in the Group. After learning of these developments, Riddle and Allen requested that the Group meet in Alexandria on September 24, 1978. The meeting was secretly tape recorded by Mrs. Riddle and the following statements made by Simmons form the basis of this lawsuit:
. . . what I had  was trying to work out here was where we could take two (2) cents out of the five (5) . . .
. . . and it would go toward payment on this land . . . I'm talking about paying for this land that we owe 2 million dollars for . . .
Now I am here to tell you today that I am ready to carry through my end. How many lots have you sold?
If I could have made a deal, . . . where Ralph [Baker] could have built this pipeline, we would have . . . It's the only deal I could make. . . .
The only  you are going to get that two (2) cents that come out of the gas that comes from Clear Branch Field.
I intend to see that nobody beats any one of us four out of an ounce of gas that comes from that field.
Let me say this again. I didn't make an accusation. I said that I was going  as long as nobody didn't try to screw me and Ralph [Baker], that you would get this percentage that I'm talking about here out of this pipeline.
Based on the overall facts stated above, Riddle filed this action against LSG and Simmons pleading several allegations. Those allegations most pertinent to this appeal include that Simmons and his alter ego, LSG, owed him damages based on claims that Simmons breached his oral joint venture agreement or contract with him and the other joint venturers, to share profits equally in connection with the management and development of the Timoz Property including the building, operating and sale of the pipeline. Riddle averred that Simmons breached his fiduciary duty to the Group by obtaining the pipeline deal for himself.
On the eve of trial, a settlement was reached between the defendants and plaintiff-intervenor Allen. Trial of the matter finally commenced on August 11, 2003, nearly 20 years from the date initially filed. Testimony was adduced over a seven-day period, with 137 items received into evidence. Many changes had occurred by this time. Robert Riddle died and his *1279 widow, Dorothy, was substituted as party-plaintiff. Gaylon Simmons divorced his wife, Annette, and remarried. Although never named as a defendant, Annette Simmons had originally aligned with Gaylon Simmons, but at the trial was aligned with her sister, Dorothy Riddle.
Following extensive post-trial briefs by the parties, a 34-page Reasons for Judgment was rendered by the trial court on June 29, 2004. The trial court found that the Group "established a joint venture for the development, management, exploitation and sharing of profits derived from their jointly-owned property." The trial court clearly viewed the Group's efforts regarding the pipeline as an agreed part of the venture, but found that in April and May of 1978, "Simmons started acting alone with regard to the Timoz property without notifying the owners . . . about what he was doing." The court emphasized Simmons' taped comments to Group members during the September 24, 1978 meeting and his $60,000 payment in 1979, as confirmation of the agreement that the pipeline undertaking was a joint venture. Finally, the court viewed Simmons' conduct and deprivation of the pipeline profits for the Group as a breach of his fiduciary duties. Judgment was rendered in favor of Mrs. Riddle and Baker against Simmons and LSG in the amount of $636,318.02 to each, with legal interest from date of judicial demand until paid. A related Judgment was filed on July 7, 2004.
On July 13, 2004, defendants filed a Motion for New Trial. After hearing was held on August 9, 2004, the trial court rendered Reasons for Judgment and Judgment on Defendants' Motion for New Trial. The trial court granted defendants' motion for new trial, and ordered that the amount of damages awarded to Riddle and Baker be reduced by $15,000 each from $636,318.02 to $621,318.02, crediting the amount Simmons deposited in the co-owners' joint bank account. In all other respects, the Reasons for Judgment and Judgment filed on June 29, 2004, and related Judgment filed on July 7, 2003, remained unchanged. Both defendants have filed suspensive appeals, with Riddle having filed an Answer to Appeal seeking modification of the award of damages.
After this appeal was filed, Baker and the defendants reached a settlement.

DISCUSSION
In LSG's principal assignment of error, it alleges that the trial court erred in holding LSG liable to Riddle. LSG asserts that LSG was never Simmons' alter ego and that Simmons had no authority, real or apparent, to bind LSG to any offer made to Riddle concerning LSG's pipeline or profits therefrom. Further, LSG urges that there is no privity of contract between LSG on the one hand and Riddle on the other; therefore, there is no contractual liability from LSG to Riddle.
A corporation is a separate entity from its shareholders. La. C.C. art. 24. A shareholder of a corporation organized after January 1, 1929, shall not be liable personally for any debt or liability of the corporation. La. R.S. 12:93(B).
Under very limited circumstances, an individual shareholder can be held personally responsible for the debts of the corporation. The determination of whether the corporate veil has been pierced and the corporation is merely the "alter ego" of the shareholder is made by considering the totality of the circumstances. Shoemaker v. Giacalone, 34,809 (La.App.2d Cir.06/20/01), 793 So.2d 230, writ denied, 2001-2614 (La.12/14/01), 804 So.2d 632. The involvement of a sole or majority shareholder in a corporation is not sufficient alone to establish *1280 a basis for disregarding the corporate entity. Id. Louisiana courts are very hesitant to hold a shareholder, officer or director personally liable for corporate obligations. Id. It should be kept in mind that in Louisiana the concept of the separation of the corporate entity from those who compose it is the general rule and is firmly established. Id; La. C.C. art. 24.
To "pierce the corporate veil" or find that a corporation is an alter ego of an individual, the courts traditionally look to five factors that, when considered with the totality of the evidence, indicate that the individual and the corporation were not actually separate entities: (1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities required for incorporation and for the transaction of corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and, (5) failure to hold regular shareholder or director meetings. Shoemaker, supra.
When shareholders assert the corporate shield as a defense from liability, the shareholders have the initial burden of proving the existence of the corporation. Once that burden is met, the party seeking to disregard the corporate shield must show the exceptional circumstances which merit piercing the corporate veil and holding the individual shareholders liable. Shoemaker, supra.
LSG argues that the trial court erroneously applied a theory of "reverse piercing" making the corporation liable for its owner's obligation. Riddle claims that the corporation, LSG, was acting as the alter ego of the sole shareholder, Simmons. "Reverse piercing" occurs when, through a legal action, assets of the corporate entity are reached to satisfy the obligations of a controlling alter ego. The alter ego may be a corporate shareholder or officer. See Reverse Piercing, 31-Jul Colo. Law. 109 (July 2002). One such reverse piercing case is Century Hotels v. U.S., 952 F.2d 107 (5th Cir.1992), where the court found that reverse piercing was permitted even where the individual did not hold stock in the corporation. Relying on Owens & Sons, Inc. v. Guastella East, Inc., 354 So.2d 571 (La.App. 4th Cir.1977), writ denied, 356 So.2d 1013 (La.1978), the court declined to utilize the doctrine of reverse piercing after determining that the alter ego also established that the corporate assets are truly the assets of the individual rather than the corporation.
Riddle does not claim that LSG was one of the original four co-owners who acquired the Timoz Property in 1977. Nor does the record contain any evidence of a contract between Riddle and LSG. The record also shows that the $60,000.00 check dated October 1, 1979, which Simmons deposited into the Group's bank account at Jonesboro State Bank (the "Simmons' check") was written on Simmons' personal bank account and not on an LSG account. Further, this action was filed well after Simmons legally sold his shareholdings in LSG, and there is no evidence that LSG failed to follow statutory formalities for incorporating and transacting its corporate affairs. Also, the record does not indicate that Simmons' sale of LSG was illegal or in bad faith. So considering, we conclude that the trial court was in error in applying a reverse veil piercing theory to find contractual liability existed from LSG to Riddle. We reverse that part of the judgment assessing damages against LSG.
Finding no liability on the part of LSG, we pretermit the remaining assignments of error specifically pertaining to LSG, and now address the specifications of error set forth by Simmons.

*1281 Joint Venture/Breach of Fiduciary Duty

Simmons contends that the trial court erred in finding the existence of a joint venture among the four co-owners of the Timoz Property. He argues that this is a question of law and not one of fact because of the involvement of immovable property. He further argues that Riddle cannot rely on parol evidence to establish a joint venture. He additionally argues that there was no showing that he breached a fiduciary duty to Riddle.
Since the essential elements of a joint venture and a partnership are the same, joint ventures are generally governed by partnership law. Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Authority, XXXX-XXXX (La.03/18/04), 867 So.2d 651, defines "partnership" as follows:
[A] juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit. Joint ventures arise only where the parties intended the relationship to exist, and they are ultimately predicated upon contract either express or implied. Smith v. Lonzo, XXXX-XXXX (La.App. 3d Cir.02/05/03), 838 So.2d 918; Pillsbury Mills, Inc. v. Chehardy, 231 La. 111, 124, 90 So.2d 797, 801 (1956), citing Daspit v. Sinclair Refining Co., 199 La. 441, 6 So.2d 341 (1942). See also, La. C.C.art. 2801.
In Riddle II, this court summarized the definition of a joint venture as follows:
A joint venture results from the undertaking by two or more persons to combine their efforts, knowledge, property or labor to engage in and carry out a single business venture for joint profit. A joint venture is analogous to a partnership and controlled largely by the rules applicable to partnerships. There must be a sharing of the profits and losses with each party having some right of control over the business. The existence or non-existence of a joint venture is a question of fact and each case must be considered according to its circumstances. The principal difference between a partnership and a joint venture is that while a partnership is ordinarily formed for the transaction of a general business of a particular kind, a joint venture is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years. No formal or specific agreement is required. Generally the relationship may be formed by an oral agreement and the existence of a joint venture may be inferred from the conduct of the parties and other circumstances.
Id. at 92.
The relationship between joint venturers, like that existing between partners, is fiduciary in character. See, Coffee Bay Investors, L.L.C. v. W.O.G.C. Co., 03-0406 (La.App. 1st Cir.04/02/04), 878 So.2d 665, at 669-670, writ denied, 04-1084 (La.06/25/04), 876 So.2d 838. A fiduciary obligation is imposed on all participants of loyalty and the utmost good faith, fairness and honestly in their dealings. The dual requirements of good faith between joint venturers and the principle that a joint venture contemplates a division of all the profits growing out of the transaction among all the venturers forbid one co-venturer from acquiring and retaining for himself any private or secret advantage in connection with the common enterprise. See Grand Isle Campsites, Inc. v. Cheek, 262 La. 5, 262 So.2d 350 (La.1972).
*1282 A partner owes a fiduciary duty to the partnership and to his partners under La. C.C. art. 2809, which provides that a partner may not conduct any activity for himself or on behalf of a third person that is contrary to his fiduciary duty and is prejudicial to the partnership. If he does, he must account to the partnership and to his partners for the resulting profits. Pursuant to La. C.C. art. 1757, obligations may arise directly from the law. The fiduciary duty owed to a partner or a co-joint venturer is one such obligation. See Sutton v. Fleming, 602 So.2d 228 (La.App. 3d Cir. 1992).
A fiduciary relationship is defined in terms of a trust, a confidence and the advantage that one party may have over another. The duty imposed on a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. This definition is made in the context of a business or financial relationship. See Plaquemines Parish Commission Council v. Delta Development Company, Inc., 502 So.2d 1034 (La. 1987). Each partner must refrain from taking any advantage of another partner by the slightest misrepresentation or concealment of material facts. The obligation is especially stringent on a partner who is managing the business, his duty being analogous to that of a trustee. This duty of disclosure holds true despite the fact that the relations between the partners have become strained or in conflict. See W.A. McMichael Const. Co. v. D & W Properties, Inc., 356 So.2d 1115 (La.App. 2d Cir.1978), writ denied, 359 So.2d 198 (La.1978).
When the question is one of the general partner's fiduciary duty, concepts of reasonableness and good faith have no application. See 59A Am.Jur.2d, Partnership § 1335, p. 910. The standard of a fiduciary's duty to his beneficiary, depending on the facts of the case, lies somewhere between simple negligence and willful misconduct or fraud with the intent to deceive; the actual intent to deceive is not required where one party is placed in such an advantageous position to the other. Mansfield Hardwood Lumber Co. v. Johnson, 263 F.2d 748, on rehearing 268 F.2d 317 (5th Cir.1959), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), rehearing denied, 361 U.S. 926, 80 S.Ct. 290, 4 L.Ed.2d 241.
The fiduciary relation upon which such obligations are consequent does not necessarily await the inception of the relationship of joint venturers. It may be predicated upon an arrangement to assume such a relationship. Thus, it is the plain and imperative duty of promoters of a venture, toward persons who are invited to cooperate in the enterprise, not only to abstain from stating as a fact that which is not a fact, but not to omit to state any circumstances within their knowledge the existence of which might in any way affect the extent or quality of the advantages held out as inducements to the others. See 46 Am.Jur.2d Joint Ventures § 34, p. 64.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless such finding is clearly wrong. Stobart v. State, 92-1328 (La.04/12/93), 617 So.2d 880; Rosell v. ESCO, 549 So.2d 840 (La.1989). In fact, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, supra. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one in light of the evidence in the record. *1283 Theriot v. Lasseigne, 93-2661 (La.07/05/94), 640 So.2d 1305; Stobart, supra; Brown v. Brookshire's Grocery Co., 38,216 (La.App.2d Cir.03/12/04), 868 So.2d 297.
The record indicates that this land development venture sprang from the parties' co-ownership of land, yet went beyond passive co-ownership. Notably, all four men were solidary debtors and therefore shared a common interest to reduce the land debt. While co-ownership requires no cooperation and can result in stalemate and partition, La. C.C. arts. 801 and 803 suggest that the mere fact of co-ownership invites "agreement" for use and management of the co-owned property. Thus, while a co-ownership relationship is not a partnership, joint venture partnership can easily result by the co-owners' agreement for ventures related to the use of the co-owned thing.
The Group, as co-owners of the Timoz Property, were not automatically partners for a pipeline. Yet, out of the Group's need to develop minerals, to push their concerns and claims with CZ regarding the minerals, and to reduce their common debt, the pipeline had become a joint venture idea and agreement that was not merely the ordinary collective dealings of co-owners with their land. The trial court's ruling recognizes this. Independent witnesses like Howell A. Dennis[5] and Gene Turner[6] confirmed that the Group wanted to build a pipeline. The following review of the facts demonstrates to us that there is no manifest error in the trial court's conclusion that the Group had reached an agreement or meeting of the minds that if they could obtain the pipeline right, they would build and operate the pipeline.
Initially, in response to Simmons' legal argument, we find that the object of the joint venture in dispute was to obtain the incorporeal property right to build a pipeline. It was a contract right to build and operate the gathering system. It related to immovable property rights  pipeline rights-of-way  and movable rights  gas severed from the ground and transported in commerce. What was lost by the Group was the contract right obtained by Simmons/LSG in the September 14, 1978 "Gas Transportation Agreement" from LIG/Kaiser. That acquisition by Simmons/LSG was not the purchase of an immovable. Therefore, Simmons' lead case of Hayes v. Muller, 245 La. 356, 158 So.2d 191 (La. 1963), is clearly distinguishable. Nor was the joint venture agreement between the Group an oral agreement to buy an immovable. It was a proposed venture to run a pipeline business that turned on the Group's ability to reach a contract with the party which controlled the flow of the gas for sale from the Clear Branch Field and which might need a pipeline group or entity to build and run the pipeline. Here, the original party who controlled the flow of the gas for sale was CZ, and the four partners negotiated with CZ. Later, LIG stepped into CZ's shoes and Simmons alone pursued LIG. This all deals with incorporeal movable rights which can be the subject of the oral agreements, there being no express written formality required by law. La. C.C. arts.1927 and 1832.
By virtue of its sale and mineral reservations to Timoz in 1975, CZ had control of *1284 the minerals over the Timoz Property. CZ reserved a 75% mineral servitude over the land. The 25% of the minerals attendant to the Timoz Property ownership of the land and eventually the Group's ownership (hereinafter the "Group's Mineral interest") was made subject to an additional reservation of executive rights[7] in favor of CZ. Additionally, as a unique power over the Group's Mineral interest, CZ was appointed in the 1975 deed as the agent of Timoz "for the purpose of executing oil, gas and mineral leases, drilling contracts and all other pre-division order agreements looking towards serious explorations" of minerals. This mandate was said to be "an agency coupled with an interest," as originally created in CZ's sale of the land to Timoz in an attempt to bind Timoz's successors in title. In Timoz's subsequent sale of the land and the 25% mineral interest to the Group, the Group was assigned any rights which may accrue to their benefit by virtue of such drilling contracts and agreements executed by CZ under its executive right and agency power.
The record indicates that CZ's sale of the Timoz Property was carved out of a larger 4,295.87-acre tract of CZ land in Jackson Parish and that CZ had a large holding of other acreage and/or mineral interests in that area of Jackson Parish. In 1975 and 1976, CZ had executed two area wide exploration agreements with Justiss-Mears Oil Company, et al. (hereinafter the "Justiss Exploration Agreements"), creating large areas of mutual interest for the development of the South Chatham and Womack areas of the Clear Branch Field. These large area wide agreements included the Timoz Property. Specifically, in committing the Timoz Property under the Womack area agreement in 1976, CZ described its contribution as "unleased mineral interests." Under the Exploration Agreement(s), CZ purportedly acted under its power as the Group's (Timoz Property's) agent and obtained rights to participate in Justiss, et al.'s mineral lease rights to the extent of a 25% working interest for wells throughout the entire area of mutual interest. Thus, although the actual Timoz Property affected by the Group's Mineral interest was later proven to be of little productive value as the Clear Branch Field was ultimately explored, in 1975-1978, CZ had contractually committed its 75% mineral interest affecting the Timoz Property and the Group's Mineral interest to the fieldwide Justiss Exploration Agreements in exchange for the right to participate on a pro-rata basis in wells throughout the entirety of the much larger area of interest.
The Justiss Exploration Agreements which CZ had negotiated and the Group's share under the fieldwide agreements became the subject of a significant dispute between the Group and CZ, which Simmons summarized to the Group's lawyer on March 16, 1978, following an initial meeting with CZ's representative, Gene Turner, on March 7, 1978. Simmons wrote:
I would like to direct your attention to Exploration Agreement and Sublease dated September 30, 1976 between CZ and Justiss covering the Womack "area of interest."
As I indicated to you by telephone, it seems that CZ has used our land, and minerals under such land, to acquire a very good deal for themselves in the Womack "area of interest." The Womack "area of interest" is comprised of twelve sections of land, all of which CZ has acreage and/or mineral interest, except *1285 section 32, 15-North, 1-West. The Exploration Agreement and Sublease reserves for CZ 3/16 of 8/8 royalty plus overriding royalties on subleases other than those acquired from Texaco, the difference between the royalty interest reserved by the original lessor and 25% of 8/8 within the "area of interest." Notwithstanding land or mineral ownership, CZ has the option to acquire 25% working interest in each and every unit within the "area of interest."
Therefore, it is my opinion that Simmons, et al, has all the rights acquired by CZ because unleased acreage, including ours, was contributed in order to gain the above benefits. Specifically, Simmons, et al, has the following interest in the Womack "area of interest."
1) 3/16 of 8/8 royalty on approximately 40 acres in section 8, 15-North, 1-West (50% ownership).
2) 3/16 of 8/8 royalty on approximately 160 acres in section 5, 15-North, 1 West (50% ownership).
3) Option to pay the proportionate part of all drilling and completion costs attributable to a 25% working interest in each unit established in the Womack "area of interest," and thereby acquire such working interest along with Crown Zellerbach.
4) Participate with Crown Zellerbach on a 50/50 basis in the overriding royalty obtained by Crown Zellerbach in paragraph 11, (a), (b), (c), (d), and (e) as a result of Crown Zellerbach and Simmons, et al, committing unleased minerals to the agreement.
5) All of the above applies to the 12 sections within the Womack "area of interest," or to the total of approximately 7,680 acres.
* * * * *
Under prevailing circumstances, I am sure that Crown Zellerbach, as our agent, fully intended that all benefits derived from such joint agreements be identical to Simmons, et al, and Crown Zellerbach in each and every way (Act of Sale dated December 2, 1975, page 2, paragraph 2, "such procuration and agency shall deem to be an agency coupled with an interest and shall run with Crown's reserved mineral interest").
Consequently, I am going to try to persuade the other partners of Simmons, et al, not to insist on bonus money for our acreage in the Womack "area of interest." Hopefully, this will serve as the first concession in an effort to settle this matter amicably.
The contentions of Simmons were later the subject of a 61-page opinion letter by his oil and gas attorney, Henri LaPayre, Jr., and ultimately became the subject of litigation initiated in 1980 by members of the Group against CZ, Justiss, LIG, and the other operators.[8] Significantly, in early 1978, the Group had commenced discussions with CZ voicing this mineral dispute in a February 20, 1978 letter from the Group's attorney to CZ, which concluded as follows:
Please accept this letter as formal legal notice that, based upon the facts available to us, the mineral interest of our clients in the subject acreage is, in our opinion, "open" or unleased acreage. We further formally advise that, subject to the information received from you in response to this letter and otherwise, and any other pertinent facts, it may be our clients position that Crown Zellerbach Corporation has so blatantly abused the executive rights stipulated to *1286 be reserved in its favor in the Crown Zellerbach-Timoz sale that any such executive rights have, as a matter of law, terminated.
Additionally, as the result of (i) the Justiss Exploration Agreements, (ii) CZ's large share of the mineral rights in the Clear Branch Field, and (iii) its need to possibly utilize the gas reserves for its timber mill activities in Louisiana, CZ had been able to obtain a preferential right to purchase the gas interests of the operators of the Clear Branch Field (Justiss, et al.) and to reserve its right to take in kind the gas attributable to its large mineral holdings and the Group's Mineral interest. These collective gas rights (hereinafter the "Call on Gas") would entitle CZ to direct the sale of the large reserves of the gas in the field.
There are two significant aspects concerning CZ's Call on Gas that are important for this dispute  a pipeline aspect and a gas purchase aspect. First, before any purchaser (or end user, including CZ) of the gas could realize these reserves, a pipeline had to be built from the Clear Branch area to a major pipeline or the location of a major user of gas. Second, a major gas user or market was required for a purchase commitment for a long-term gas purchase contract with the attendant take or pay obligations of the late 1970's for a field with an estimated 43,096 billion cubic feet in reserves. The Group directed its focus on the pipeline need for the field which (i) would ensure that shut-in gas reserves would begin flowing and generating mineral revenues or royalties to service their debt, and (ii) was within their potential to construct and operate, given the ability of two pipeline men in the Group. The Group was out of its league, however, regarding the purchase of the gas from the field. So realistically, their pipeline hopes, which was the agreed upon joint venture, would only come to fruition through a relationship with a major party in need of gas.
With this backdrop and following the somewhat threatening letter of their attorney of February 20, 1978, the Group met with CZ's representative, Turner, with both a carrot and a stick approach. The stick was the litigation cloud concerning CZ's alleged abuse of the Group's Mineral interest and their contentions regarding a larger economic stake in the fieldwide area of interest because of the Justiss Exploration Agreements. The Group no doubt downplayed that threat in hopes of the realization of a deal to build the pipeline.
At some point in these negotiations beginning in early March, CZ made it clear to the Group that it was not going to use the gas for the CZ mills in Louisiana, and that CZ had to find a party that could build the pipeline and purchase the gas. The Group acknowledged to CZ that it could not purchase the gas. Turner's testimony confirmed that the Group had an interest derived from their disputed Mineral interest "to participate in the buying [and selling] of the gas." He also indicated that he felt obligated to keep them apprised of any gas transactions for the field because of the executive rights controversy and their assertions regarding their Mineral interests. He testified that the Group had some leverage because of the controversy. Most importantly, Turner confirmed that the Group wanted to build a pipeline and that Simmons was to be apprised of any deal struck by CZ in directing the gas from the field by its exercise of the Call on Gas. Turner said, "I think Mr. Simmons got back with me and said words to the effect that, when you hear something about this deal, before you absolutely say yes to it, we'd like to know about it."
*1287 Simmons' potential for access to this information from CZ soon materialized because as Stipulation No. 15 states: "In April 1978, one of the operators of the Clear Branch Field [pursuant to the Justiss Exploration Agreements] presented CZ with a proposed gas purchase contract, which triggered CZ's 30-day right of first refusal on gas from Clear Branch Field." Turner let Simmons know of this development and CZ's proposal to LIG. CZ then concluded its "Assignment of Preferential Right to Purchase Gas and Right to Take In Kind" with LIG (a pipeline company) which had a contract with Kaiser (as gas purchaser), to do the deal that the Group (as pipeline venturers, but not gas purchaser), could not consummate. Simmons, upon being informed of the CZ/LIG deal, promptly began arrangements to obtain the pipeline portion of the undertaking for himself, and as the trial court found, he did not disclose those negotiations to the other three partners.
From this review of the record, the parties' course of dealing with each other demonstrates that they had a meeting of the minds to obtain the right to build and operate a pipeline. In addition to the above, Simmons also worked in the beginning of 1978 to obtain a $2,200,000 financing package for the Group's efforts for the pipeline. To the contrary, the view asserted by Simmons is that once the Group missed out acquiring the CZ Call on Gas, all bets were off regarding their envisioned joint venture and that Simmons was free to deal for himself. That argument nevertheless concedes that if the Group had acquired the CZ Call on Gas and then sold the gas directly to Kaiser and bought transportation rights along LIG's pipeline from the Black Lake interconnect, then Simmons was obligated with the Group to jointly build the very same pipeline. The argument also discounts the Group's leverage from the threatened litigation by which Simmons obtained knowledge of the LIG deal. While the Group's objective was subject to the contingency of reaching an agreement with the party (CZ or LIG) which controlled the sale and delivery of gas reserves from the field, such contingency did not make the parties' commitment and agreement for the joint venture any less binding on the Group.
Simmons also argues there was no express agreement to share in the losses. However, we do not find that conclusive as to the nature of the relationship, since such an agreement may be implied from an agreement to share profits. His proposal implied the use of $.03 of the revenue stream for costs of the pipeline and a sharing of profits. It is not essential that the parties agree, expressly or impliedly, to share the losses, and when the nature of the undertaking is such that no losses other than time and labor in carrying out the undertaking are likely to occur, the agreement of the parties to divide profits may be sufficient to stamp the undertaking as a joint venture. See Latiolais v. BFI of Louisiana, Inc., 567 So.2d 1159 (La.App. 3d Cir.1990).
Simmons' own correspondence substantiates a finding that this was a joint venture.[9] Simmons' conduct during his initial dealings with CZ indicates he was acting on behalf of his partners in a joint venture. There is also ample evidence in the record that each partner contributed in some respect to make their investment in the Timoz Property profitable. Even though the potential for development of the land into lake-front property was hinging *1288 on the completion of Caney Lake, Riddle managed to sell some lots. Allen played a significant role in arranging financial backing. More importantly, Baker and his company were no doubt instrumental for the proposed venture to obtain the right to build a pipeline. Baker had specialized expertise for pipelines and control over his company in early 1978, before Simmons obtained control of LSG. Baker believed that his expertise was committed to the Group for this idea which Simmons ultimately exploited for himself. Ironically, Simmons consulted with Baker and his son and employed Baker's company for the building of the pipeline.
The most damning evidence against Simmons' denial of the pipeline joint venture is his admissions in the September 1978 group meeting at the time he confessed to his newly acquired pipeline contract. While Simmons is correct that his offer of $.02 from the pipeline revenue stream was a non-binding, unfulfilled, gratuitous proposal for "paying for this land," the offer nevertheless creates an undeniable inference that Simmons agreed that the pipeline venture was the commitment and objective of the Group and that his secretive success in obtaining the goal should be shared. We therefore conclude that a joint venture for the acquisition and operation of the pipeline was proven to exist in the spring of 1978.
Having determined the existence of the joint venture, Simmons' breach of his fiduciary duty as a member of the partnership is clear. The fiduciary duty between Simmons and Riddle is the same that applies to partners. A partner is a mandatary and fiduciary owing a duty of full disclosure of relevant business information and may not conduct any activity, for himself or on behalf of a third person, that is contrary to his fiduciary duty and is prejudicial to the partnership. La. C.C. arts. 2814 and 2809. The mandatary is bound to restore all profits to his principals, "including things he received unduly." La. C.C.art. 3002. A mandatary owes interest, from the date used, on sums of money of the principal that the mandatary applies to his own use. See, La. C.C.art. 3005 and United States v. Faser, 303 F.Supp. 380 (1969).
Here, the record shows that in May 1978, Simmons purposefully set on a course to obtain for himself, through his newly acquired corporation, the pipeline deal with LIG/Kaiser. As noted, Simmons' notification to the Group that LIG had acquired the Call on Gas was very misleading. While the Group perceived this notice to indicate a pipeline deal was unattainable for the Timoz Group, Simmons secretly negotiated his deal with LIG/Kaiser and signed the contract before he ever revealed it to his co-venturers. The record indicates the Group was alarmed when they found out that Simmons had contracted with LIG/Kaiser to build the Clear Branch Pipeline System[10] and these facts precipitated the Group calling for the meeting in Alexandria on September 24, 1978. These facts adequately prove that Simmons began acting independently while dealing with CZ and LIG, forgoing advising the other three men in the Group of his negotiations. When he finally informed Baker, the evidence shows that he purposely intended to exclude Riddle *1289 and Allen from reaping any financial benefit from the pipeline deal. In our view, Simmons' behavior rose to the level of willful misconduct with intent to deceive the other co-venturers.
Moreover, Simmons acted as an agent for the Group in his dealings with CZ. Such authorization gave Simmons specific knowledge and business connections the others were not privy to. In fact the evidence adequately establishes that the pipeline deal stemmed directly from the contacts Simmons made on behalf of the Group. The cloud on CZ's Call on Gas created by the Group's claims would have followed the transaction of the gas rights into LIG. Indeed, LIG was made a party to the later litigation concerning CZ's alleged abuse of the Group's mineral interest. Therefore, it can be inferred that Simmons continued to use the cloud of litigation in negotiating with LIG. In our view, Simmons was acting in a position of trust that he breached by seizing a lucrative business opportunity for his own benefit or that of his company. We find Simmons' behavior to be a failure of the fundamental fiduciary relationship between partners that imposes on them the obligation of the utmost good faith, fairness, loyalty and integrity in their dealings with one another with respect to partnership affairs, which prejudiced the joint venturers.
In conclusion, the contract that symbolizes the object of the Group's joint venture and represents the result of Simmons' breach of fiduciary duty is the September 14, 1978 Gas Transportation Agreement between LSG (Simmons) and LIG/Kaiser. LSG had seven to nine months to build the pipeline. In the September 24, 1978 meeting with the partners, Simmons admitted that they should share in that contract. He insured that his partners would not dispute his right to the contract by promising them $.02, and he also allowed Baker's company to build a portion of the gathering lines. Ultimately, however, the trial court found that Simmons paid the partners in 1979 only one $60,000 payment attributable to the pipeline venture and that his actions constituted a breach of his fiduciary duty to his partners. We find no manifest error in the trial court's rulings.

Prescription
In another assignment of error, Simmons reargues prescription based upon a one-year period of prescription. Since we have determined a breach of a fiduciary duty which occurred in 1978, a ten-year period of prescription applies. Barksdale v. Lincoln Builders, Inc., 32,857 (La. App.2d Cir.06/21/00), 764 So.2d 223, writ denied, 2000-2646 (La.02/09/01), 785 So.2d 821. This assignment of error is without merit.

Estoppel
Next, we address the issues of estoppel asserted by Simmons. The record indicates that Riddle filed twice for bankruptcy protection, once in 1988 and once in 1994. Simmons takes the position that because Riddle failed to disclose to the bankruptcy court an alleged "joint venture" ownership interest in a pipeline, or list this lawsuit as an asset, he should be judicially estopped from pursuing this claim. He argues that both Riddle and his counsel knew about this lawsuit, but nonetheless concealed it from the bankruptcy court.
In Dance v. Louisiana State Univ. Med. Ctr. At Shreveport, 32,592 (La.App.2d Cir.12/10/99), 749 So.2d 870, writ denied, XXXX-XXXX (La.03/31/00), 759 So.2d 76, the court determined that one must show that the party's failure to disclose an asset was intentional or with wrong motive to be estopped. Despite Simmons' argument to the contrary, we find no evidence to support an allegation of an intentional or *1290 wrong motive to hide this lawsuit as a possible asset when Riddle filed for bankruptcy protection. Counsel retained by the Riddles in the bankruptcy matter was the same one that filed this action against Simmons and LSG. He died prior to the trial of the matter and the record contains no evidence that this omission was done in bad faith on the part of the attorney or the Riddles. This suit has been in litigation for the past 20 years, with a judgment finally granted in 2004. To conclude that Riddle intentionally withheld evidence from the bankruptcy court some twenty years ago would be purely speculative. This argument is without merit.[11]

Damage Award
We now address certain issues raised on appeal concerning the damages awarded by the trial court. We note from the outset that several of the assignments of error asserted by the parties overlap and therefore will be disposed of at one time.
The basic theory of reparation for the breach of a fiduciary duty is that the damaged party should be returned as nearly as possible to his condition prior to the act causing damage. Scurria v. Hodge, 31,207 (La.App.2d Cir.10/30/98), 720 So.2d 460, writs denied, 99-0011 (La.03/19/99), 739 So.2d 782. Likewise, since such breach by a fiduciary has been characterized as a constructive fraud or fraudulent breach of trust, the principle of La. C.C. art.1997 is implicated. That article provides:
An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.
Regarding the damages, the trial court concluded that if Simmons followed through on his promise stated at the recorded meeting on September 24, 1978, Riddle's share of the debt incurred in the acquisition of the Timoz Property would have been satisfied. The trial court based its conclusion on the evidence that Riddle's share of the pipeline's value and revenues was sufficient to pay down the property debt preventing the ultimate foreclosure against Riddle's interest in the Timoz Property. We find that this view of Riddle's loss, both from the standpoint of the lost pipeline value and the lost real estate, is the correct assessment of the damages, particularly in view of Civil Code Article 1997.
In assessing the value of the pipeline and Riddle's damages, the trial court found that the most reliable data for determining gas volumes transported through the pipeline are the volumes reported to and filed in the records of the Louisiana Office of Conservation. There were two expert witnesses who testified regarding the value of the pipeline revenues. Mr. William S. Young, III, testified on behalf of Simmons, while Mr. David L. Dunnavant testified on behalf of Riddle. In its final analysis, the trial court found the testimony of Dunnavant to be more credible.
In an attempt to understand the pipeline value which Riddle lost, Dunnavant reviewed the records of the Office of Conservation and determined the actual monthly volumes of gas transported through the pipeline system from March 1979 through *1291 May 2003. In one calculation which he called the low case value for the pipeline, he multiplied the total volume for that twenty-four-year period times $.02 per mcf. This represented the $.02 promise to the partners made by Simmons in their September 1978 meeting. In his high case scenario, Dunnavant adjusted the revenues to the partners according to the escalation provision for the transportation rate in the LIG Contract. This granted LSG an annual ½¢ increase in the rate for ten years. After ten years, Dunnavant continued to adjust the rate higher by the consumer price index. In his high case scenario, Dunnavant testified that he held the costs of operating the pipeline to the original three-cent rate implied in Simmons' promise to the partners. However, he indicated that holding costs to such a rate was unrealistic and at the conclusion of his testimony he suggested a middle ground value for the pipeline.
The results of Dunnavant's calculations were as follows:

 Low Case  $1,284,820.46 Total Revenue on 2¢ Rate
 $ 371,705.12 Riddle's Share
 High Case  $3,235,344.03 Total Revenue on Adjusted Rate
 $ 808,836.01 Riddle's Share
 Best Estimate  $ 2,356,00.00 Adj. Revenue less realistic cost
 $ 589,000.00 Riddle's Share

In another related aspect of the trial court's ruling on damages, the trial court rejected Simmons' contention that the pipeline was unprofitable. Specifically, the trial court found the testimony by Mr. Young that costs for the pipeline included a two million dollar ($2,000,000.00) management fee which was not actually paid lacked credibility. We also note that Simmons recognized the so-called "demand charges" under the LIG/Kaiser contract which was designed to pay for the capital investment of the pipeline over and above the $.05 transportation fee.
Based upon the evidence of the actual volumes of gas which the pipeline serviced over time, the trial court chose the low case estimate, since it reflected the amount offered by Simmons to the Group in 1978. By answer to the appeal, Riddle contends that the trial court's award based upon the $.02 promise was error.
We agree with the trial court that the evidence of actual volumes of delivered gas is the best manner to gauge the value of the pipeline venture which Riddle lost. However, because we have determined that Simmons breached his fiduciary duty to the partners, the value of the lost pipeline venture should not be limited to Simmons' own breached "offer" for a $.02 settlement. The value should be gauged in terms of the actual escalating rate of the LIG contract which Simmons/LSG realized. Additionally, despite Simmons/LSG's sale of the pipeline in 1986, the value of the pipeline would depend on the revenue rate under the LIG contract adjusted in accordance with the contract and for inflation and the volume of transported gas over the lifetime of the operation. Regardless of the time when the volumes or expected volumes are considered, whether measured in 2003 after 24 years of actual production or estimated in advance in 1979 when production began or at the time of the 1986 sale of the pipeline, the methodology employed by Dunnavant to determine the pipeline value based on gas volumes was appropriate. Likewise, Dunnavant's use of the escalating transportation *1292 rate more accurately reflects the pipeline's value. His high side scenario, however, improperly held the cost factor for the pipeline static at $.03. This leaves his middle ground value as the best estimate which he based upon his experience with the evaluation of the costs for similar pipeline systems. We therefore determine that Dunnavant's $589,000.00 damage estimate should be employed for the measure of Riddle's loss.
The trial court next correctly determined that the pipeline revenues deprived from Riddle could have been employed beginning in 1979 to pay off Riddle's indebtedness on the Timoz Property. By 1983, when LSG had become creditor on that debt, Riddle's share of the debt had risen to $443,012.10. The trial court therefore offset the pipeline value, determined by Dunnavant from the accrual of revenues, against the accrual of the indebtedness which was increasing during the time period in question. Using the $589,000.00 value which we have now determined for the pipeline, a similar offset of the property debt will produce a judgment of $145,987.90 in favor of Riddle ($589,000.00 minus $443,012.10). Since this portion of the judgment is based upon pipeline revenues that would have accrued in more recent years after the payment of the property debt, the employment of legal interest from the September 25, 1983, date of judicial demand for this portion of the judgment would be inappropriate. Dunnavant's calculation of this value was based upon revenues which accrued through May 2003. We will therefore fix judicial interest for this portion of the award from May 1, 2003 until payment.
In considering Riddle's loss of the Timoz Property, the trial court recognized that the land value presumably increased substantially after the new Caney Lake was completed and that the land could later be developed as lakefront property. However, it found that the most reliable calculation of the value of the Timoz Property was the value set in the document executed by the parties on January 7, 1980. (See Stipulation No. 35). At that time, the partners set the selling price at $1,500 per acre. Hence, the trial court multiplied 1,887 by $1,500.00 per acre to set the value of the Timoz Property at $2,830,500.00, with Riddle's share to be valued at $707,625.00. This amount was reduced by $15,000.00 in an amended judgment for Riddle's share of the Simmons check of $60,000.00, which was paid into the Group's joint account.[12] This resulted in a value set at $692,625.00 for Riddle's share of the Timoz Property.
Riddle now disputes the trial court's evaluation of the property claiming that the value should reflect the greater values realized from the property after the development of Caney Lake. Riddle also claims that the trial court's evaluation did not properly consider the mineral value for the property and notes that Simmons has retained that mineral interest in his share of the Timoz land.
From our review of the evidence, the trial court's decision to place a value of $1,500.00 per acre is not manifestly wrong. It reflects the property's value at the time of the breach of the fiduciary duty which set into motion Riddle's losses. Riddle's award for that portion of the judgment, $692,625.00, will be accompanied by legal interest from the date of September 25, 1983, which is the date of judicial demand. Legal interest serves the purpose of protecting the value of that which was lost, *1293 but the future gain in the market value of the land or through mineral development thereafter is irrelevant. Additionally, the record indicates that Riddle took legal action against CZ over the value of the minerals in the 1887-acre tract and any such rights that may have extended beyond that acreage due to CZ's exploration contracts. (See Stipulation Nos. 36 and 37). Riddle's assertion for additional damages for the loss of minerals is without merit.

Failure to Mitigate Damages
Simmons' allegation that the trial court erred by not considering Riddle's failure to mitigate his damages is also without merit. Simmons' complaint is based upon his claim that three years prior to the foreclosure on the Timoz Property, LSG's attorney informed Riddle that "the $.02 per mcf theory was a myth because LSG did not owe Riddle any portion of its pipeline revenue, and any oral proposal to donate same by Simmons was unenforceable, without the required corporate authority and entirely unsupported by any consideration." Simmons contends that despite this warning, Riddle failed to mitigate his damages. This argument is without merit as the record clearly shows that Simmons is liable for the commitment he made to the joint venturers. Moreover, the evidence establishes that Riddle's financial ruin for the most part is attributable to Simmons' breach of the fiduciary duty owed the Group. We find no evidence to indicate that Riddle was in a financial position to mitigate his losses but, instead, he was forced to file for bankruptcy protection in both 1988 and 1994.

CONCLUSION
We reverse the trial court's judgment holding LSG liable to Riddle for damages. We affirm the trial court's judgment holding Simmons liable to Riddle. Damages awarded to Riddle are in the sum of $589,000.00 for his 25% interest in lost pipeline revenues, less his 25% share of the property debt on the Timoz Property in the amount of $443,012.00 and less his 25% share of the Simmons check in the amount of $15,000.00 for a total of $130,988.00. Legal interest is ordered to run on this sum from May 1, 2003 until paid.
Further, Riddle is awarded the sum of $707,625.00 for his 25% interest in his lost interest in the Timoz Property, with judicial interest running from date of judicial demand on September 25, 1983, until paid. Costs of these proceedings are assessed to Simmons.
REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART.
APPLICATION FOR REHEARING
Before STEWART, CARAWAY, PEATROSS, DREW, and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] As stipulated by the parties, the interest of Robert E. Riddle and his wife, Dorothy Riddle, in the Timoz Property was actually purchased in the name of their son, Gary P. Riddle, as recognized in a counter letter between them. An act evidencing a "transfer" from Gary later occurred. Robert E. Riddle is now deceased and Dorothy Riddle has been substituted as the party-plaintiff representing the Riddle interest. We will make any factual references to Dorothy in the name "Mrs. Riddle" and will reference any actions of Robert E. Riddle and the plaintiff's claim in general as "Riddle."
[2] As noted by the trial court when accepting the uncontested facts submitted in the parties' joint pretrial order, the facts, as submitted, were not stated in chronological order. We have attempted to place them in a more logical sequence, omitting certain stipulations that were repetitive or not pertinent to the issues on appeal.
[3] The "call on gas" is a term used in the industry to describe a preferential right to purchase gas.
[4] LIG is defined in Stipulation No. 17 as an established corporation in the natural gas pipeline business.
[5] Mr. Dennis worked for the law firm of Jumonville, Hartley, Plauche and Broadhurst and provided legal services to the Group relating to the Timoz Property. (See Stipulation No. 8).
[6] Mr. Turner was the representative of CZ.
[7] The Louisiana Mineral Code defines executive rights as "the exclusive right to grant mineral leases of specified land." La. R.S. 31:105.
[8] See stipulation nos. 36 and 37 above.
[9] Two such examples are the letter Simmons wrote to Bill Broadhurst dated November 2, 1977, as shown in Stipulation No. 7 and the one he wrote to Howell A. Dennis, Jr. dated March 16, 1978 entered into evidence.
[10] This pipeline system consisted of approximately 30 miles of 16-inch pipeline and 18 miles of 8-inch pipeline beginning in Jackson Parish through Winn Parish and terminated in Natchitoches Parish. LIG and Kaiser were obligated to make monthly principal and interest payments in order to retire the approximate $8 million pipeline debt by 1989. LIG and Kaiser paid LSG a transportation fee for all gas transported through this system from several other producers.
[11] Because of our affirmation of the trial court's rulings on joint venture and breach of fiduciary duty, Simmons' assignments of error pertaining to detrimental reliance, allegedly utilized by the trial court, and Riddle's release of Allen regarding a claim relating to the parties' indebtedness for the Timoz Property were without merit. The judgment against Simmons is not based upon any obligation, gratuitous or otherwise, arising from unfulfilled promises of September 24, 1978. Therefore, the judgment does not depend on the concept of detrimental reliance. Also, Allen did not breach a fiduciary duty and was not solidarily bound with Simmons on the obligation which results in this judgment.
[12] Although Riddle asserts on appeal that the trial court was in error when it amended the judgment to offset the $15,000.00 for his share in the Simmons check, a review of the evidence indicates that this offset was clearly warranted. We find no error in this regard.