CARAWAY, J.
bin this case, the son of the decedent sued his mother and siblings concerning the ownership of an alleged family busi *916 ness. The business arose as the result of a formula for soap products which the father believed was divinely inspired in 1981. For years before his death, the father worked with the son in the sale of the products. The son filed this declaratory judgment action after the death of his father and before the formal opening of a succession, claiming ownership of a corporation which owned the formula and sold the products. The trial court denied plaintiff relief and dismissed this action. The son appeals. For the following reasons, we reverse the trial court’s dismissal of the action and remand. Upon remand, the succession of the deceased father, which has now been opened, should be joined in this action, and the trial for determination of the existence of a separate business entity and its ownership shall proceed.

Facts

This declaratory judgment action was filed following a family dispute over stock ownership in a closely-held corporation. The products sold by the business were special soap products. In July 1981, Clayton Tedeton, who is now deceased, claimed that he “received” a formula from God. After receiving the formula, Clayton gathered all of the ingredients listed in the formula. He then spent several weeks creating and experimenting with the formula in order to determine its attributes. Eventually, Clayton determined that the formula created soap products. Because this was the second miracle |2and revelation which he believed to have been bestowed upon him, he named the product Miracle II.
Initially, the formula was produced in the kitchen sink and later in an old bathtub outside of Clayton’s house and the product was given away. Clayton’s family consists of his wife, Patsy, and two daughters, Deborah and Pamela, who are the appellees in this case and his son, Byron K. Tedeton, Sr. (“Kirk”), who is the appellant in this controversy. In the early 1980s, all of Clayton’s family participated in some way in the production of the soap, if only by stirring the product. Once Clayton became aware of the great attributes of Miracle II, he began to have other ideas for selling the product.
On March 11, 1982, Clayton and Kirk incorporated the business and formed Ted-co, Inc. At the time of Tedco’s incorporation, Kirk was 24 years old. All of the parties acknowledged that this corporation was created to manufacture and sell Miracle II products. In the articles of incorporation and initial report, Kirk and Clayton were both identified as incorporators, registered agents, and the initial directors. No stock was issued at this time and no by-laws were adopted. While there was no undisputed evidence presented as to how the corporation was capitalized in the early 1980s, several people testified that they lent Clayton and Kirk some money for the corporation. However, they were all repaid within a few years.
For several years, the corporation was somewhat dormant, at least financially. Yet, Miracle II was supposedly still produced by efforts of Clayton, Kirk, and family members. Conflicting testimony regarding when |3the business was first operational was presented by the parties. Patsy argues that Clayton mortgaged everything that he owned in order to start Tedco. Kirk, on the other hand, argues that Clayton mortgaged everything in order to salvage his prior businesses and that it was not until Clayton lost everything that he devoted himself tirelessly to growing Tedco as a business.
The record shows that Clayton and Patsy lost everything in 1988. As a result of their financial difficulties, Clayton and Patsy settled their foreclosure proceedings with the bank by selling all of Clayton’s *917 prior businesses, their house, and possessions. In 1988, Patsy moved away from Monroe to live with her mother. She lived separate and apart from Clayton until 2002 when Clayton had a stroke. Their two daughters, Deborah and Pamela, also moved to live near their mother. When his wife and daughters left, Clayton moved onto property that Kirk inherited from Clayton’s mother and that served as Ted-co’s office until 2008. After moving out, Patsy applied for and received supplemental disability income (SSI). To be eligible, Patsy valued her resources at less than $2,000.
After Clayton’s financial troubles, Clayton, Kirk, and Sue (Kirk’s wife) fully committed themselves to making Tedco a success. Sue and Kirk even made a pact with Clayton that they would tirelessly devote themselves to growing the corporation for ten years. During this incubation period, Kirk and Sue ran the day-to-day operations and Clayton entrusted them with the secret Miracle II formula. In 2003, Tedco was financially successful enough to move to another location, on Well Road in West Monroe, and ^expand its headquarters. Clayton built his house on the same tract of land. He lived there until his death in 2007. While Clayton lived on the Well Road property, the deed was signed by Kirk in his capacity as president of Tedco, and the property’s ownership stood in the name of Tedco.
From the beginning, according to Kirk, Clayton did not express any interest in managing the corporation, although he listed himself as the founder and CEO of Miracle II and Tedco, Inc., on his business card, brochure, and billboards. Instead of being actively involved in Tedco’s business affairs, Clayton received a salary and traveled all over the country preaching and testifying about how he received the for-muía and the miraculous attributes of the Miracle II products.
After Clayton’s stroke, Patsy would sometimes travel with Clayton and attend these seminars. She testified that she would spend two or three nights each week with Clayton in West Monroe. Patsy testified that Tedco’s distributors would set up the seminars for Clayton. At these Miracle II outreach programs, Clayton would have Tedco’s products available for purchase. While Kirk acknowledged the “CEO” corporate title which his father claimed, Kirk asserted himself as president of Tedco and claimed Clayton did not have an ownership interest in Tedco or ever claim to have one.
The first Tedco tax returns were for 1993, 1994, and 1995. These initial tax returns were prepared, filed, and signed by Kirk, in his capacity as president. In each one Kirk stated that no one owned 50% or more of an ownership interest in the corporation. Even though he claims that he owned Rail of Tedco at that time, Kirk explained that he checked “no” under this question because under community property laws he and his wife owned the corporation. Tedco did not file another tax return for the next few years. Tedco’s next tax returns filed in 2000, 2001, and 2002 were prepared by Dale Soignier, a CPA. These were the first tax returns that stated that Kirk owned 100% of Ted-co’s stock. In addition, these tax returns listed Kirk, Sue, and Clayton as corporate officers of Tedco, Inc.
From 2003-2007, Gary Booth took over as Tedco’s CPA. The only significant change in the tax returns occurred with regard to Clayton’s salary. Clayton stopped receiving a salary and instead was paid rental payments even though he was not leasing any specific property to Tedco. Booth and Kirk testified that this was done to reduce Clayton and Tedco’s taxes. In *918 2006 and 2007, Clayton was no longer listed as an officer of Tedco. Instead, Byron K. Tedeton, Jr., Kirk’s son, is listed in his place. Furthermore, Booth prepared a schedule of “shareholders loans” from 2002-2007 to supplement the tax returns; this schedule identifies loans made to shareholders Kirk, Kirk Jr., Clayton, and Sue.
In 2005, the FDA opened an investigation into Tedco, Inc. due to allegations of contaminated Miracle II products. During the course of the investigation, the FDA wanted to know which parties had ownership interests in Tedco. The parties testified that the FDA tried to stop Clayton from preaching about the Miracle II products until ownership of Tedco was determined. As a result of this investigation, the corporation hired an attorney, Stephen Dean, to complete the necessary documents in order toj^bring Tedco up to date and in full compliance with corporate formalities. In an attempt to prove Tedco’s ownership, Dean created minutes of annual board meetings for the past 23 years and issued one stock certificate for 1,000 shares, the maximum amount of registered stock, to Kirk Tedeton. While the stock certificate was allegedly issued in 2005, it was dated March 15, 1982, the date of Tedco’s incorporation. This stock certificate was signed by Kirk, as President, and Sue as Secretary-Treasurer. Kirk, Sue, and Dean testified that Clayton was present when the stock certificate was issued and did not object or dispute that Kirk owned 100% of Tedco. In addition to flaws in the stock certificate’s date, all of the annual board minutes merely reiterate the same details — the election of Kirk and Sue as President and Secretary-Treasurer, respectively, and their duties as officers. After these documents were created, Dean testified that they were sent to an attorney in Washington, D.C., who was helping them resolve these matters with the FDA. Nevertheless, the law firm in D.C. did not have any record of having received any of these corporate documents.
Upon Clayton’s death, ownership of the business has become a source of conflict for this family. Thereafter, all of the remaining Tedeton family members sat down with Dean, Kirk and Sue to discuss various financial matters. Kirk took the position that he owned the corporation.
In August 2007, Patsy hired an attorney to handle her husband’s succession. As a result, information about the corporation and its shareholders was sought from Kirk. Based on threats of litigation, Kirk filed this action in October 2007 seeking a declaratory judgment that he 17owns 100% of Tedco, Inc.’s stock. He named as defendants his mother and two sisters since at that time, no formal succession proceeding for Clayton’s estate had been opened.
After a three-day trial, the trial court rendered written reasons for judgment on July 30, 2010. Of significant concern to the court was the unopened succession of Clayton and the necessity for the succession’s participation in the action. The Reasons for Judgment state:
The Court is of the opinion that the intervention in this proceeding by the succession of Clayton L. Tedeton would be the most judicially economical manner in which to address these concerns and reach a complete, proper, and just adjudication.
Nevertheless, the trial court did not attempt to exercise any power under La. C.C.P. art. 927(B)[1] for the joinder of the succession in the action.
*919 Regarding the substance of the dispute, the Reasons for Judgment recognized that the defendants, along with Kirk, did not dispute the need for declaratory relief, so that the respective interests or ownership of all the family members in the business could be decided. However, in one telling statement, the court’s ruling referred to the asset or object at the center of the controversy in varying terms as either, the “business enterprise,” the “business operation,” the “Miracle II operation,” or “Ted-co, Inc.” With this unclarity over the business entity at issue, the trial court then made the primary focus of its ruling the ownership not of the business itself, but the ownership of the Miracle II formula. The ruling states:
|sEven if the Court were to grant petitioner’s request and issue a declaratory judgment that he owns 100% of the stock of Tedco, Inc., as purportedly transferred to him by Clayton L. Tede-ton, such a ruling would not end the uncertainty nor would it conclude this controversy concerning Clayton L. Te-deton’s estate and the ownership of or entitlement to the Miracle II formula.
[[Image here]]
The Court noted earlier that, to a large extent, rendition of a declaratory judgment is not appropriate and that the Court exercises its discretion pursuant to Code of Civil Procedure Article 1876 and refuses, to a large extent, to render any judgment or decree because it would not completely terminate or conclude this controversy or the uncertainty surrounding it. However, with respect to one aspect of this proceeding, the Court can lay to rest any uncertainty or controversy and render a complete and just adjudication. Specifically, as noted earlier in these reasons, the Court has been presented with no evidence nor any law in support of the proposition that Clayton L. Tedeton validly transferred the ownership interest of his surviving spouse, Patsy Tedeton, in the community asset in the form of the formula which ultimately became the Miracle II product and which is the entire basis for the business operation subsequently called Tedco, Inc.
After these initial Reasons for Judgment, all parties requested that the trial court withhold formal judgment until efforts for mediation could be made. Additionally, in this interim period, Clayton’s succession was opened in the Fourth Judicial District Court as a separate proceeding. Following the unsuccessful settlement of the dispute, the parties returned to court on March 10, 2011, and received from the trial court additional supplemental reasons for judgment. In that oral ruling, the trial court first adopted its earlier written ruling. Referring specifically to the ownership of the Miracle II formula, the trial court again reiterated that (1) “[b]y no means ... could the interest of the surviving spouse have been transferred to Kirk ... ”, and (2) the Tedco corporate documents “fail to establish any valid transfer whatsoever” of the formula. The court concluded, “Clayton |<,Tedeton’s ownership interest in the Miracle II product remains an asset of his succession.”
In its final summation, the trial court stated:
In sum, the plaintiffs request for a declaratory judgment that he owns one hundred percent of the stock in Tedco is denied due to insufficient evidence presented by the plaintiff to carry his re *920 quired burden of proof on that issue. Likewise, the defendant’s request that the court issue a declaratory judgment that Kirk Tedeton has zero interest in the Tedco operation is denied for the reasons expressed both in the initial reasons for judgment and in these reasons. In fact, the issue of ownership of stock in Tedco is largely irrelevant to the consideration of the remaining issue in this proceeding. Namely the ownership interest in the formula for Miracle II and the right to use same for production of any product which is in accordance with these reasons found to be a matter to be resolved by means of the rules applicable to intestate successions and community assets of the decedent in intestate successions all as governed by our jurisprudence and statutory authorities.
The later written judgment of the trial court expressing these rulings first decreed that Kirk’s action for declaratory judgment was denied. The judgment then made the following decree:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Court finds that the community of ac-quets and gains existing between Clayton and Patsy Tedeton owned one hundred (100%) percent of the interest in the formula for the production of Miracle II product and one hundred (100%) percent of Clayton Tedeton’s ownership interest in Tedco, Inc. at the time of Clayton Tedeton’s death.
Kirk now appeals the judgment making two assignments of error. First, he asserts that the trial court erred in rendering a judgment which was beyond the scope of his declaratory judgment which involved only the declaration of the ownership of Tedco. Next, he argues that the trial court erred in rendering judgment despite its recognition that it could not put an end to the controversy. Finally, the relief sought by Kirk as appellant is | inmost unusual in that he does not seek a judgment declaring rights in his favor as plaintifPappellant, but merely a remand of “the case to the Fourth Judicial District Court to await the outcome of the pending Succession of Clayton Tedeton.”

Discussion

In Kirk’s original petition for declaratory judgment, he prayed to be recognized as “the sole owner of the entirety of the authorized stock in Tedco, Inc.” The trial court’s judgment simply denied Kirk’s action for this declaratory relief while at the same time recognizing that the former community property regime of Clayton and Patsy owned “one hundred (100%) percent of Clayton’s ownership interest in Tedco, Inc.” at the time of Clayton’s death. Those rulings do not clearly address who are the owners of Tedco, while, nevertheless, acknowledging the existence of a separate corporation. The “ownership interest” in Tedco of Clayton and Patsy recognized by the judgment is not stated to be all or only a portion of the stock or equity in the business. Likewise, the denial of Kirk’s request for sole ownership appears to have left open the possibility of his partial ownership. This ambiguity is further revealed in the trial court’s refusal to accept the defendants’ argument that Kirk had a “zero interest in the Tedco operation.” The trial court made it clear that ownership of Tedco was largely irrelevant. With that view by the trial court, the only clear ruling of the judgment was that the community of Clayton and Patsy solely owned the Miracle II formula so that the formula had never become an asset of the Tedco business.
| nFrom the assignments of error by Kirk, we agree that the focus or scope of the declaratory judgment which he pled concerned the ownership of a business entity or enterprise operating under the Ted- *921 co name. If there is no separate business entity in existence which Kirk owns at least in part, the ownership of the Miracle II formula is irrelevant to the action as Kirk does not claim his personal ownership of the formula prior to the death of Clayton. Additionally, a critical implication of the trial court’s puzzling judgment is that if the Miracle II formula is not an asset of the business entity but solely the personal asset of Patsy and Clayton’s succession, the Tedco business entity is not just “largely irrelevant” but indeed worthless. The Miracle II formula is the asset which might have made Tedco a separate business entity instead of merely the personal proprietorship of Clayton.
With this situation, we will first review the only definitive portion of the judgment, that portion which recognized the personal ownership of the Miracle II formula by Mr. and Mrs. Tedeton. Our analysis will examine these questions:
(1) What type of property is the Miracle II formula;
(2) Whether the Miracle II formula was the community property of Mr. and Mrs. Tedeton; and
(3) Could Clayton transfer the Miracle II formula to a business entity?
Rights, obligations, and actions that apply to a movable thing are incorporeal movables. La. C.C. art. 473. The idea or creation of a formula is a right related to a movable thing as it comprises the list of ingredients |12that when combined in the right proportion result in a movable product. Accordingly, we find that the formula was an incorporeal movable.
Things in possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property. La. C.C. art. 2340. In this case, the Miracle II formula came to Clayton during his marriage to Patsy. As a result, the legal presumption arises that the Miracle II formula became a part of their community of acquets and gains. Additionally, one of the classifications of community property involves “property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse.” La. C.C. art. 2338.
From these principles, the Miracle II formula may be classified as an incorporeal movable property that was part of the community property regime of Mr. and Mrs. Clayton Tedeton.
Next, regarding the transfer of incorporeal movable things, the Civil Code articles on the consent to a contract and the law of sale provide guidance as follows:
Art. 1927. Consent
A contract is formed by the consent of the parties established through offer and acceptance.
Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
[[Image here]]
Art. 2448. Things that may be sold
All things corporeal or incorporeal, susceptible of ownership, may be the object of a contract of sale, unless the sale of a particular thing is prohibited by law.
1 iaArt. 2456. Transfer of ownership
Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid.
*922 Art. 2481. Incorporeals, method of making delivery
Delivery of incorporeal movable things incorporated into an instrument, such as stocks and bonds, takes place by negotiating such instrument to the buyer. Delivery of other incorporeal movables, such as credit rights, takes place upon the transfer of those movables.
From these provisions we do not find that an onerous transfer of ownership of the Miracle II formula required a written contract or the need for an instrument setting forth a written formula.[2]
Regarding Clayton’s ability to transfer incorporeal movable property of the community during the marriage, our law of matrimonial regimes provides in Civil Code Article 2346 that “[e]ach spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law.” A reading of the articles governing the management of community property which follow Article 2346 does not reveal to us that this incorporeal movable required the joint management action of both spouses for its disposal or transfer. One of the spouses acting alone could transfer ownership of the Miracle II formula.
An illustration of an actual transfer of community property into a family corporation occurred in the case, Succession of Geagan, 212 La. 574, 33 So.2d 118 (1947). After the husband’s death, the surviving spouse and stepson were the parties in this dispute over the community property. The wife claimed that her husband had improperly transferred community assets, 114including movable and immovable properties, with the intent to deprive her of her share of the community by the incorporation and capitalization of a family business. She sought recognition of her ownership of one-half of the properties placed into the corporation. The evidence showed that at the time of the incorporation, the assets transferred by the husband to the business were valued at $69,400 for which the husband received 694 shares of stock issued for $100 per share. Finding the corporation to have been validly and legally formed, the court ruled:
Under the facts in this case, when the deceased transferred to the corporation the property belonging to the community and received in exchange therefor shares of stock in the corporation, the value of the community of acquets and gains which existed between him and his wife was in no way diminished, because the shares of stock represented the property transferred and belonged to the community of acquets and gains existing between the parties, and the surviving spouse in community is not thereby prejudiced in any way.
Id., 33 So.2d at 123. The capitalization transaction for the corporation in Geagan was therefore recognized by the court as an onerous exchange involving community property.
Though the community asset in the present case involved an incorporeal movable property right, the Miracle II formula, the trial court’s reasons for judgment and the judgment itself failed to examine the above law and acknowledge the possibility that Clayton acting alone could transfer the formula in his capitalization of a separate business entity. This was error based upon the court’s unfounded concerns regarding the community property law and the general law pertaining to the transfer *923 of incorporeal movables. However, since we will remand this case for further evi-dentiary proceedings, as discussed further below, we now reverse the trial court’s |1sruling that the Miracle II formula remained owned solely as the community property of Mr. and Mrs. Tedeton at the time of his death. As a procedural matter alone, we agree with Kirk’s argument on appeal that such ruling was beyond the scope of this declaratory judgment action as presented to the court. Upon remand, the central question regarding the alleged creation of a separate business entity must be answered. Any finding of a separate business entity would coincidentally determine the ownership of the Miracle II formula as the essential asset of that business.
The question of whether Clayton and Kirk and any other family member created a separate business entity and the ownership of such entity was the focus of much evidence presented to the trial court. The weakness in the incorporation documents for Tedco, Inc., particularly the lack of issuance of stock at is inception, makes the question of a business entity difficult, involving fact issues for decision. Upon remand, the following are the principles of law for corporations, joint venture partnerships, and sole proprietorships implicated by the record.
A corporation must have full and complete organization and existence as an entity, and in accordance with the law to which it owed its origin, before it could assume its franchise or enter into any kind of contract or transact any business. Ahrens & Ott Mfg. Co. v. Caire, 5 Teiss. 154, 1908 WL 1299, 5 Orleans App. 154 (La.App.Orleans 1908). If the parties comply with the corporate formalities, then, “once established, the separate nature of the corporate existence must be respected.” Joseph v. Hospital Service Dist. No. 2 of Parish of St. Mary, 05-2364 (La.10/15/06), 939 So.2d 01206. A presumption of corporate existence arises once a certificate of incorporation is issued by the Secretary of State, and “other irregularities shown in matters of internal administration of its affairs cannot vitiate the legal existence of the corporation.” American Snuff Co. v. Stanton, 13 La.App. 321, 127 So. 633 (La.App. 1st Cir.1930). But, “stockholders of stock corporation or members of nonstock corporation never become owners in common of corporate property.” Screwmen’s Benev. Ass’n of Louisiana v. Monteleone, 168 La. 664, 123 So. 116 (1929). Thus, “assets owned by a corporate entity are the property of that entity, and are not owned by the shareholders or partners.” McClanahan v. McClanahan, 03-1178 (La.App. 5th Cir.2/23/04), 868 So.2d 844, writ denied, 04-1175 (La.9/3/04), 882 So.2d 609.
Regarding the issuance of stock, La. R.S. 12:52 provides in pertinent part:
C. The consideration for shares issued otherwise than as stated in subsection B of this section, shall be paid in cash or in corporeal or incorporeal property, or services actually rendered to the corporation, the fair value of which is not less than the dollar amount of the consideration fixed for the shares, before the shares are issued.
La. R.S. 12:52(C); cf. Succession of Quaglino, 232 La. 870, 95 So.2d 481 (1957).
The jurisprudence has considered ownership disputes for a corporation where either stock was not issued or was not validly issued. In Fireplace Shop Inc. v. Fireplace Shop of Lafayette, Inc., 400 So.2d 702 (La.App. 1st Cir.1981), the court conducted a review of the facts after it determined a stock certificate was improperly issued. Based upon the parties’ initial verbal agreement and the way that the parties dealt with and |,, controlled the cor *924 poration, the court determined that the parties each owned one-half of the corporation. The court expressed the longstanding rule of the jurisprudence, as follows:
Although a stock certificate is prima facie evidence of corporate ownership, it is to be distinguished from actual ownership which may be determined from all the facts and circumstances of a case.
Id. at 703.
Additionally, a somewhat parallel analysis would be applicable for the consideration of whether a partnership or joint venture was created in the absence of the proper incorporation of Tedco. Unlike corporate law, parties do not have to ñle any documents with the Secretary of State in order to create as between themselves a partnership or a joint venture. “Since the essential elements of a joint venture and a partnership are the same, joint ventures are generally governed by partnership law.” Riddle v. Simmons, 40,000 (La.App.2d Cir.2/16/06), 922 So.2d 1267, writ denied, 06-0793 (La.6/2/06), 929 So.2d 1259. No formal or specific agreement is required. Generally, the relationship may be formed by an oral agreement and the existence of a joint venture may be inferred from the conduct of the parties and other circumstances. Id.
The partnership is created by a contract between two or more persons to combine their efforts or resources in determined proportions. La. C.C. art. 2801. There are no hard and fast rules in making the determination of whether a partnership exists and each ease must be considered on its own facts. Harris v. Wallette, 538 So.2d 728 (La.App. 2d Cir.1989). Importantly, Louisiana law provides that each partner participates equally in |18profits, commercial benefits, and losses of the partnership, unless the partners have agreed otherwise. La. C.C. art. 2803.
Finally, in the absence of the creation of a corporation, partnership, or joint venture in this case, a sole proprietorship arising from Clayton’s initial revelation and ownership of the formula might be determined. A sole proprietorship is not a legal entity, but merely a designation assigned to a manner of doing business by an individual; while the individual involved in the sole proprietorship may consider the business to be separate and distinct from his/her person, there exists no legal distinction between the individual and the business. Robinson v. Heard, 01-1697 (La.2/26/02), 809 So.2d 943.
With these principles, the trial court shall determine on remand whether Clayton created a separate business entity for the sale of Miracle II products, and if so, the ownership of that business entity at the time of his death.
Finally, as an additional peremptory ground for our remand of this matter, we find that the Succession of Clayton Tede-ton should be joined as a party in this action. La. C.C.P. art. 927. As plaintiff, Kirk shall amend his petition pursuant to La. C.C.P. art. 934 within 30 days of the finality of this judgment to join the succession in the proceeding. The lengthy trial which has already occurred in this matter may then proceed with the allowance for additional evidence by all parties.
11 ^Conclusion
The trial court’s judgment is reversed. The peremptory exception of nonjoinder of the Succession of Clayton Tedeton is recognized by this court. The case is remanded with the order for plaintiff to amend his petition to include the Succession of Clayton Tedeton within 30 days and for the trial of the declaratory action to proceed consistent with this opinion. Costs of appeal are assessed equally to the parties.
*925 REVERSED; PEREMPTORY EXCEPTION GRANTED; ORDER RENDERED; AND CASE REMANDED WITH INSTRUCTIONS.

. La. C.C.P. art. 927(B) provides in pertinent part: The nonjoinder of a party, peremption, res judicata, the failure to disclose a cause of action or a right or interest in the plaintiff to *919 institute the suit, or discharge in bankruptcy, may be noticed by either the trial or appellate court on its own motion.

. Regardless of this lack of the necessity for a writing, La. C.C. art. 1846 does address proof of an oral contracts over $500.